IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| STEVEN B. BAGLIVO,<br><br>Plaintiff,<br><br>v.<br><br>MUTUAL OF OMAHA INSURANCE COMPANY,<br><br>Defendant. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>No. 1:20-cv-15605-KMW-MJS<br><br>**OPINION** |

**Louis M. Barbone, Esq.**
JACOBS & BARBONE, ESQS.
1125 Pacific Avenue
Atlantic City, NJ 08401

**Scott E. Becker, Esq.**
1123 S. Main Street
Pleasantville, NJ 08232

*Counsel for Plaintiff Steven B. Baglivo*

**Colleen M. Duffy, Esq.**
MCELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
1300 Mount Kemble Avenue
PO Box 2075
Morristown, NJ 07962-2075

*Counsel for Defendant Mutual of Omaha Insurance Company*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

This case involves a dispute over an individual insurance policy. Plaintiff Steven B. Baglivo ("Plaintiff") owns a New Jersey disaster-restoration company that repairs properties damaged by fire and water. In 2016, Plaintiff applied for a disability income insurance policy with Mutual of Omaha Insurance Company ("Defendant"). During the application process, Plaintiff represented that his role was primarily administrative and nonphysical, stating that, while his workers performed the physical restoration work, he was a business manager who was seldom

present at construction sites. Relying on these representations, Defendant issued a long-term disability income policy providing monthly benefits in the event of partial or total disability.

Plaintiff first submitted a claim for disability benefits in July 2017, reporting that a hip condition limited him to part-time work. By February 2018, however, he asserted that he was totally disabled and unable to work or earn any wages. In claiming the maximum benefits under the policy, Plaintiff reaffirmed his "sedentary" administrative role, but maintained that hip pain and weakness prevented him from even walking or standing.

Defendant subsequently investigated his claim, but agreed to pay Plaintiff disability benefits pending its review. As part of that investigation, Defendant retained an orthopedic surgeon to conduct an independent review of Plaintiff's medical records and claim submissions. The specialist found that Plaintiff's hip condition imposed only limited restrictions on his sedentary work—a conclusion endorsed by Plaintiff's own treating physician. Based on these findings, Defendant terminated his benefits and reinstated his premium obligations. In total, Defendant had paid Plaintiff $197,740 in disability benefits.

Plaintiff initiated this action in December 2019, asserting a single claim for breach of contract under New Jersey law. He alleges that he is totally disabled, contends that Defendant's contrary determination was baseless, and claims that he is entitled to the full benefits of the policy. However, Plaintiff now offers a materially different account of his job responsibilities. In sworn statements offered in this case and elsewhere, Plaintiff now asserts that his job was physically demanding, describing himself as a "hands-on" manager who, on a daily basis, performed construction and demolition tasks alongside his workers—contradicting his earlier representations that his work was administrative and sedentary.

Defendant initially answered the complaint by denying liability, but later amended its pleading to assert several counterclaims under New Jersey common law and the New Jersey Insurance Fraud Prevention Act ("IFPA"). Relying on Plaintiff's conflicting statements, Defendant alleges that Plaintiff made material misrepresentations both in applying for the policy and in subsequently seeking benefits. Based on these allegations, Defendant seeks rescission of the policy, as well as damages under the IFPA.

Discovery is complete, and both parties now move for summary judgment under Federal Rule of Civil Procedure 56. The Court has considered the parties' written submissions, finds oral argument unnecessary, and decides the motions on the papers. For the reasons set forth below, Defendant's motion is granted in part, and Plaintiff's motion is denied in its entirety.

## II.    BACKGROUND

### A.    The Application

The relevant facts of this case begin on January 21, 2016, when Plaintiff completed and submitted a written application for a disability income insurance policy with Defendant. (ECF No. 108-1 at 2–6.[1]) The application sought long-term disability insurance providing, in the event of total disability, a base monthly benefit of $9,400 and an additional monthly benefit of $2,600 for a social insurance substitute. (*Id.*)

Defendant's application process is designed to gather information necessary for an underwriting evaluation—specifically, to determine the applicable risks and the terms on which coverage may be issued, if at all. (ECF No. 108 ¶¶ 3–4.[2]) For disability income insurance, that

---

[1] *See* Application for Individual Disability Income Insurance (ECF No. 108-1 at 2–6.)

[2] *See* Declaration of Colette Howard, Senior Product Owner of Mutual of Omaha Insurance Company (ECF No. 108.)

information naturally focuses on the nature of the applicant's occupation, employment, and job duties. (*Id.* ¶ 7.) Defendant obtains this information through a written application, a telephone interview, and, when necessary, follow-up inquiries with either the applicant or the applicant's insurance agent. (*Id.* ¶ 10.) Here, Plaintiff's application involved each of these steps.

In his written application, Plaintiff identified himself as the sole proprietor of a company "Statewide Commercial." (ECF No. 108-1 at 2.) When asked to describe his specific occupation and duties, he listed his title as "Owner" and stated that his "exact duties" consisted solely of "Administration." (*Id.*) Accompanying Plaintiff's application was an "Agent/Producer Statement" completed by his insurance producer, Eric Brooks. (*Id.* at 12–13.[3]) In this statement, Mr. Brooks indicated that, based on Plaintiff's responses, he was quoted a policy classified as "Occupational Class 4A"—a Mutual of Omaha risk category encompassing "executive and professional occupations where most work is performed in an office or clinical setting with minimal environmental hazards and limited direct supervision of persons with manual responsibilities." (*Id.* at 12, 282.[4])

That same day, Plaintiff participated in a fourteen-minute telephone interview with a Mutual of Omaha representative. (*Id.* at 8–10.[5]) During the interview, Plaintiff clarified that he was the self-employed owner of Statewide Commercial Cleaning, LLC—a disaster-restoration company specializing in the repair of fire- and water-damaged properties for insurance companies ("Statewide"). (*Id.* at 8.) He also reported ownership of a second business, Paramount Public Adjusters, LLC—a public-adjusting firm that prepares and negotiates insurance claims

---

[3] *See* Agent/Producer Statement, dated January 21, 2016 (ECF No. 108-1 at 12–13.)

[4] *See* Mutual of Omaha Disability Income Choice Portfolio – Product and Underwriting Guide (ECF No. 108-1 at 278–84.)

[5] *See* Mutual of Omaha's Underwriting Information Page (ECF No. 108-1 at 8–10.)

("Paramount"). (*Id.*) Plaintiff stated that he employed approximately six individuals, relied heavily on subcontractors, and oversaw both businesses. (*Id.*)

Upon reviewing Plaintiff's application and interview responses, Defendant's underwriters sought clarification regarding his specific job duties. (*Id.* at 16.[6]) In response to a direct underwriting inquiry on January 29, 2016, Plaintiff, through his agent, stated the following:

- Statewide and Paramount were complementary operations: Statewide performed restoration work, while Paramount handled insurance adjusting, both sharing an office and a tax return.

- Plaintiff did *not* personally perform *any* of the restoration work, that he relied on subcontractors for such work, and that he was on-site less than ten percent of the time.

(*Id.*[7])

### B.    <u>The Policy</u>

Defendant issued a Long-Term Disability Income Insurance Policy (the "Policy"), effective February 10, 2016. (ECF No. 108-5 at 20–41.[8]) Relying on the information Plaintiff provided, Defendant's underwriters designed a policy consistent with Occupational Class 4A, which determined the premium rate, coverage terms and duration, benefit amounts, and available riders. (ECF No. 108 ¶¶ 21–50.)

By the Policy's terms, Defendant agreed, in exchange for a monthly premium of $1,153.73, to insure Plaintiff's income against the risk of partial or total disability resulting from a covered illness or injury. (ECF No. 108-5 at 39.[9]) In such an event, Defendant agreed to pay monthly

---

[6] *See* Mutual of Omaha Underwriting Annotation Summary Page (ECF No. 108-1 at 16–17.)

[7] Plaintiff has not denied making these specific representations to Mr. Brooks. *Compare* Def.'s Statement of Material Facts ("SMF") ¶ 21 (ECF No. 107-2), *with* Pl.'s Responsive Statement of Material Facts ("RSMF") ¶ 21 (ECF No. 112.)

[8] *See* Mutual of Omaha Long-Term Disability Income Insurance Policy, bearing policy number 489076-92 (ECF No. 108-1 at 20-31.)

[9] *See* Schedule of Benefits (ECF No. 108-1 at 39.)

benefits commensurate with the degree of disability—full benefits payable for total disability and proportionate benefits for partial disability. (ECF No. 108-1 at 24.) "Total Disability" entailed a base benefit of $9,400 per month, plus an additional $2,600 per month as a social insurance substitute. (*Id.*)

On March 3, 2016, Plaintiff executed a "Policy Delivery Receipt," confirming receipt of the Policy and once again affirming that all answers and statements made in connection with his application were both "true and complete." (ECF No. 108-1 at 46, 48.[10])

### C.  <u>Plaintiff's Claim for Disability Benefits</u>

On July 5, 2017, Plaintiff submitted a formal claim for disability benefits under the Policy, alleging disability due to "hip and knee issues and pain, weakness, [and] stiffness," first arising in February 2017 (the "Claim"). (ECF No. 108-5 at 37.[11]) Defendant's claim forms asked Plaintiff to describe his occupational duties and to explain how his disability interfered with performing them. Among other things, the forms asked Plaintiff to list his occupational duties "in order of their importance" and to provide "a detailed description of each." (ECF No. 108-5 at 40.[12]) Consistent with the administrative role he had described the year prior, Plaintiff responded as follows:

> Duty:        "Sales/Marketing"
> Description:  "Surveying fire damaged, water damaged, mold damaged properties to price quote across New Jersey/other."
>
> Duty:        "Manage staff & subcontractors"
> Description:  "On site management of staff/others, completing demolition remediation, restoration, janitorial and other related services my company performs."

(*Id.*)

---

[10] *See* Policy Delivery Receipt and Statement of Good Health (ECF No. 108-1 at 48.)

[11] *See* Insured's Statement for Disability Benefits, dated July 5, 2017, bearing claim number 584487770900 (ECF No. 108-5 at 37.)

[12] *See* Insured's Occupational Description, dated July 5, 2017 (ECF No. 108-5 at 40.)

In this same form, Plaintiff was asked to classify and describe the physical demands of these duties. In response, Plaintiff indicated that they were "sedentary," involving only "sitting, walking, and standing." (*Id.*) To the extent his job required lifting, Plaintiff stated that it involved objects weighing no more than ten pounds. (*Id.*) Finally, when asked how his claimed disability interfered with the performance of his job duties, Plaintiff wrote that it limited his ability to "walk, climb stairs, climb ladders, sit, carry items, [and] navigate through service locations safely." (*Id.*)

In further support of his Claim, Plaintiff submitted an "Attending Physician's Statement" completed by his primary care physician, Dr. Marlene Rodriguez, (ECF No. 108-5 at 42.[13]) In this statement, Dr. Rodriguez reported that Plaintiff was experiencing right-hip pain, which was attributed to osteoarthrosis associated with a cam lesion. (*Id.*) Although Plaintiff was cleared to work, Dr. Rodriguez opined that he was only able to do so on a part-time basis. (*Id.*)

Defendant subsequently undertook a review of Plaintiff's Claim, but based on his representations, agreed in the interim to pay monthly disability benefits and to waive premium payments. (ECF No. 107-2, ¶¶ 47–48.[14]) By February 2018, however, Plaintiff claimed that his condition had deteriorated to the point of total disability. (ECF Nos. 107-4 at 2[15]; 108-5 at 50.[16]) Plaintiff informed Defendant that he was experiencing worsening pain and weakness that caused his hip to "give out," severely restricting his physical mobility. (*Id.*) He further reported that he had completely stopped working as of February 1, 2018, and that he was earning no income. (*Id.*)

---

[13] *See* Attending Physician's Statement of Dr. Marlene Rodriguez, M.D., dated June 29, 2017 (ECF No. 108-5 at 42.)

[14] The record does not disclose when precisely Defendant began paying Plaintiff benefits, or even whether those payments were for total or partial disability. Nonetheless, the parties agree that the Policy's 90-day Elimination Period concluded on May 18, 2017, and that Defendant's payments became effective on that date. *See* Def.'s SMF ¶¶ 47–48 (ECF No. 107-2); Pl.'s RSMF ¶¶ 47–48 (ECF No. 112.)

[15] *See* Policyowner's Continuance of Disability Report, dated February 7, 2018 (ECF No. 107-4 at 2.)

[16] *See* Letter of Steven M. Baglivo, dated February 8, 2018 (ECF No. 108-5 at 50.)

However, in a supplemental medical statement, Dr. Rodriguez noted only a single limitation—that Plaintiff was "unable to go up [and] down a ladder." (ECF No. 108-5 at 45.[17])

For the remainder of 2018, Defendant continued investigating Plaintiff's Claim, paying disability benefits and waiving premiums. Plaintiff, for his part, submitted periodic updates to Defendant concerning his disability status. (ECF No. 107-4 at 3–8.[18]) In each report, Plaintiff consistently maintained that he was totally disabled, reaffirming that he was not working and earning no income. (*Id.*) Dr. Rodriguez also submitted additional statements to Defendant in June, September, and December 2018. (ECF No. 108-5 at 45–47.[19]) In each of these statements, Dr. Rodriguez repeated the same diagnosis and the single limitation regarding ladder use. (*Id.*) At no point did Dr. Rodriguez opine that Plaintiff was totally disabled. (*Id.*)

Defendant ceased making payments to Plaintiff on January 17, 2019.[20] Around this time, Defendant retained a board-certified orthopedic surgeon, Dr. Michael Chen, to conduct a peer review of Plaintiff's file. (ECF No. 108-5 at 52.[21]) Based on his review of Plaintiff's medical records—as well as the sedentary duties Plaintiff himself had described and attested to—Dr. Chen concluded that Plaintiff was capable of sustaining sedentary work on a full-time basis, albeit with certain limitations. (*Id.* at 57.)

---

[17] *See* Attending Physician's Supplementary Statement of Dr. Marlene Rodriguez, M.D., dated February 6, 2018 (ECF No. 108-5 at 45.)

[18] *See* Policyowner's Continuance of Disability Reports, respectively dated May 3, 2018 (ECF No. 107-4 at 3.), June 14, 2018 (*id.* at 6), September 20, 2018 (*id.* at 7), and December 20, 2018 (*id.* at 8.)

[19] *See* Attending Physician's Supplementary Statements of Dr. Marlene Rodriguez, M.D., respectively dated June 14, 2018 (ECF No. 108-5 at 45), September 20, 2018 (*id.* at 46), and December 20, 2018 (*id.* at 47.)

[20] The record provides few details regarding Defendant's initial decision to discontinue benefit payments; it reflects only that the parties agree Defendant ceased making payments on January 17, 2019. *Compare* Compl. ¶ 11 (ECF No. 1), *with* Second Am. Answer ¶ 11 (ECF No. 54.)

[21] *See* Peer Review of Dr. Michael Chen, M.D., dated February 28, 2019 (ECF No. 108-5 at 52–58.)

Thereafter, Defendant shared Dr. Chen's report with Dr. Rodriguez for review and comment. (ECF No. 108-5 at 60.[22]) In the letter enclosing the report, Defendant flagged Dr. Rodriguez's prior notations concerning Plaintiff's ladder use, but noted the use of a ladder "appear[ed] to be a smaller part of his occupational duties." (*Id.*) It thus asked Dr. Rodriguez to review Dr. Chen's report and confirm whether she agreed with the findings (*Id.*) On August 19, 2019, Dr. Rodriguez advised Defendant that she agreed with Dr. Chen's assessment. (ECF No. 108-5 at 72.[23])

By letter dated August 26, 2019, Defendant informed Plaintiff of Dr. Chen's report, stating: "The opinion of that surgeon was that your records did not support any restrictions or limitations that would prevent you from working 40 hours in your sedentary occupation." (ECF No. 108-5 at 74.[24]) It further noted Dr. Rodriguez's concurrence. (*Id.*) Accordingly, the letter notified Plaintiff that his Claim was being closed, that no further benefits were payable under the Policy, and that his monthly premium payments would resume. (*Id.*) It also informed Plaintiff of his right to submit additional information and outlined the internal appeal process. (*Id.*)

Plaintiff did not appeal Defendant's decision or submit any additional supporting documentation. (ECF No. 107-2, ¶ 56.) In total, Plaintiff received $197,740 in disability benefits. (*Id.* ¶ 57.)

---

[22] *See* Mutual of Omaha's Letter to Dr. Rodriguez, dated May 2, 2019 (ECF No. 108-5 at 60.)

[23] *See* Mutual of Omaha's May 2, 2019 letter, signed and returned by Dr. Rodriguez on August 19, 2019 (ECF No. 108-5 at 72.)

[24] *See* Letter of Mutual of Omaha, dated August 26, 2019 (ECF No. 108-5 at 74.)

###    D.    **The Instant Action**

On December 10, 2019, Plaintiff commenced this action in New Jersey state court, which Defendant subsequently removed to this Court on the basis of diversity jurisdiction. (ECF No. 1.[25]) In his Complaint, Plaintiff asserts a single cause of action for breach of contract under New Jersey law, alleging that he has been wrongfully denied disability benefits owed under the Policy. (ECF No. 1-1 at 2–3.[26]) He maintains that he is totally disabled, that Defendant's conclusion to the contrary was "without basis," and that he is thus entitled to the Policy's maximum benefits. (*Id.* at 3.) He seeks payment of all past-due and future benefits, together with interest, attorneys' fees, and costs. (*Id.*)

Defendant initially answered the Complaint and denied liability. (ECF No. 11.) Since then, it has amended its pleading to assert several counterclaims against Plaintiff under New Jersey law. (ECF No. 54.[27]) Pointing to discovery obtained during this case, Defendant contends that Plaintiff made numerous, material misrepresentations during the course of their relationship. According to Defendant, Plaintiff initially portrayed himself as a business executive, which led the company to offer him a high-benefit, low-risk disability insurance policy. Plaintiff continued to hold himself out as such in connection with his Claim, stating that he was physically unable to perform the "sedentary" tasks of his job. But after Defendant terminated his benefits on the ground that he was not totally disabled, Plaintiff purportedly reversed course and has since submitted multiple sworn

---

[25] Defendant is incorporated under the laws of Nebraska and maintains its principal place of business in Omaha. *See* Notice of Removal (ECF No. 1, ¶ 7.) Plaintiff is a citizen of New Jersey. (*Id.* ¶ 6.) Because the amount in controversy exceeds the $75,000 threshold set forth in 28 U.S.C. § 1332, the Court properly exercises subject matter jurisdiction over this action.

[26] *See* Compl. (ECF No. 1-1 at 2–4.)

[27] *See* Def.'s Second Am. Answer (ECF No. 54.)

statements recasting himself as a physically active, hands-on worker who is unable to perform the material and substantial duties of a job he had never previously described as his own.

First, Defendant cites sworn statements Plaintiff made to the U.S. Social Security Administration ("SSA"). Less than a week after Defendant terminated his benefits, Plaintiff completed and submitted a sworn application for Social Security Disability Insurance ("SSDI") benefits. (ECF No. 108-1 at 265–72.[28]) In his application, Plaintiff represented that he held two distinct jobs: one as the "Hands On Owner" of Statewide, and another as the "Hands On Owner" of Paramount. (*Id.* at 266–267) With respect to his role at Statewide, Plaintiff described himself as a "lead worker" who spent nine hours per day, five to six days per week, performing:

- "Hands on Fire & Water Construction Restoration Services,"
- "Hands on Environmental Mold Remediation/demo," and
- "Hands on commercial cleaning."

(*Id.* at 266.)

Plaintiff further stated that his job at Statewide required using machines, tools, or other equipment, and that six and a half hours of his workday were spent handling, grabbing, or grasping large objects. (*Id.*) When asked to identify what objects he lifted and carried, and how frequently, Plaintiff responded:

- "Heavy construction/Lumber (daily)."
- "Equipment & Tools daily."
- Title cabinetry, carpet, other daily."
- "Demolition debris daily."

(*Id.*) He further reported that between one-third and two-thirds of his workday involved lifting objects weighing upwards of 50 pounds or more, and that he sometimes lifted in excess 100

---

[28] *See* U.S. Social Security Administration Work History Report (ECF No. 108-1 at 265–72.)

pounds. (*Id.*) And when asked whether he supervised others on the job, Plaintiff responded affirmatively, but indicated that only 15% of his time was spent on supervision. (*Id.*)

Plaintiff described his work at Paramount in similar terms, stating that he used machines, tools, or other equipment, and that he lifted objects of the same weight and frequency as in his work at Statewide. (*Id.* at 267.) In this role, Plaintiff stated that he worked three hours per day, five to six days per week, during which he:

- "Walked/climbed/crawled through fire & water damaged building[s] to do inventories & measurements to write insurance loss reports," and "[a]lso had to move Items to do so";
- Lifted, carried, and moved "heavy objects (Lumber/contents) in fire & water damaged property losses to list contents and measure off areas."

(*Id.*)

In addition to Plaintiff's SSDI application, Defendant also points to the sworn testimony Plaintiff offered during his deposition in this case on August 23, 2022. There, Plaintiff testified that he had insured himself specifically "for fire and water restoration" work, stated unequivocally that such work was "not a sedentary job," and maintained that he purchased this Policy precisely for the numerous hazards that work entails. (ECF No. 108-1 at 161.[29]) Among other statements, Plaintiff's testimony included:

- stating that he was "on job sites every single day" and for "every single loss";
- explaining how "[f]or six and a half hours [he] would physically be doing something" (*e.g.* handling "big objects"), and stating that his job "commonly would be to lift heavy objects";
- describing how his workday entailed "moving debris," "climbing ladders," "scaling roofs," "investigat[ing] above drop ceilings," and "crawl[ing] through crawl spaces" to inspect damage from underneath; and
- emphasizing his "hands-on" involvement and participation in the services his company performs.

(*Id.* at 73, 76, 81–82, 91–92, 164–70, 182–83, 192.)

---

[29] *See* Transcript of Deposition Testimony of Steven M. Baglivo (ECF No. 108-1 at 50–263.)

Beyond Plaintiff's representations concerning the nature and scope of his work, Defendant also contends that he misrepresented his disability status in connection with his Claim. According to Defendant, Plaintiff's federal income tax returns reveal that during every year of his alleged disability, Plaintiff continued to operate Statewide and other businesses; actively participated in their operations and management; and generated millions of dollars in gross receipts through active construction, restoration, and contracting work. (ECF Nos. 108-2, 108-3.[30]) This evidence, Defendant submits, is inconsistent with any claim of total disability.

In sum, Defendant contends that it relied on Plaintiff's representations in classifying him as a 4A risk and issuing the Policy, and that had Plaintiff fully and accurately disclosed the nature of his work, the company would not have issued the Policy on the terms provided. Defendant further asserts that it relied on Plaintiff's statements concerning his disability status in evaluating and paying his Claim, and that those statements were likewise materially false and misleading.

### E.    The Parties' Motions

Discovery in this matter is complete, and both parties now move for summary judgment under Federal Rule of Civil Procedure 56. In his motion, Plaintiff seeks summary judgment in his favor on his breach-of-contract claim, asserting that he is totally disabled under the terms of the Policy and that Defendant wrongfully terminated his benefits. (ECF No. 99.[31]) He also seeks summary judgment on Defendant's counterclaims, arguing that the insurer lacks sufficient evidence to establish fraud or misrepresentation as a matter of law.

---

[30] *See* Declaration of Anthony C. Sanders, CPA (ECF No. 108-2); *see also* IRS Forms 1040 (U.S. Individual Income Tax Returns) of Steven M. Baglivo, for tax years 2016 through 2023 (ECF No. 108-3.)

[31] *See* Pl.'s Mot. for Summ. J. (ECF No. 99.)

Defendant's motion seeks rescission of the Policy on the ground that it was procured through material misrepresentations of fact. (ECF No. 107.[32]) Because rescission would render the Policy void *ab initio*, the company contends that summary judgment is necessarily warranted on Plaintiff's breach-of-contract claim. Defendant also moves with respect to its counterclaims under the IFPA.

### III.    LEGAL STANDARD

A court may grant summary judgment when the materials of record "show[ ] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If satisfied, the burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* (internal quotation marks omitted) (emphasis in original). To survive a motion for summary

---

[32] *See* Def.'s Mot. for Summ. J. (ECF No. 107); *see also* Pl.'s Opp'n (ECF No. 113); Def.'s Reply (ECF No. 116.)

judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements[.]'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## IV.    DISCUSSION

### A.    Plaintiff's Claim

Both parties move for summary judgment on Plaintiff's claim for breach of contract. In his motion, Plaintiff contends that the undisputed record evidence establishes his total disability and his entitlement to the maximum benefits under the Policy. Defendant opposes that motion and, in turn, moves for summary judgment on what it describes as its "claim for rescission," arguing that the Policy was procured through material misrepresentations concerning Plaintiff's occupation and should therefore be voided. In the alternative, Defendant maintains that even if rescission is unwarranted, Plaintiff's breach-of-contract claim fails on its merits because the evidence does not establish total disability within the meaning of the Policy. Because rescission, if warranted, would extinguish the Policy and preclude any claim for contractual benefits, the Court addresses Defendant's motion first.

### i.    *Rescission*

Under New Jersey common law, rescission is a recognized equitable remedy that "voids [a] contract *ab initio*, meaning that it is considered 'null from the beginning' and treated as if it

does not exist for any purpose." *First Am. Title Ins. Co. v. Lawson*, 827 A.2d 230, 237 (N.J. 2003) (quoting BLACK'S LAW DICTIONARY 1568 (7th ed. 1999)). A party seeking rescission must identify and establish a substantive basis for that remedy. *See Feighner v. Sauter*, 614 A.2d 1071, 1075 (N.J. Super. Ct. App. Div. 1992). Within the insurance context, courts have long permitted rescission of a policy where the insurer pleads and proves a cause of action for equitable fraud based on misrepresentations made in its procurement. *See, e.g.*, *Chance v. McCann*, 966 A.2d 29, 41 (N.J. Super. Ct. App. Div. 2009) (reciting three elements of equitable fraud).

Here, Defendant purports to move for summary judgment on its "claim for rescission." (ECF No. 107-1 at 13.) While the factual premise of Defendant's request is readily understood, the legal foundation of its argument is insufficiently developed and doctrinally unsound. As previously indicated, rescission is a remedy—not a cognizable cause of action. For that very reason, courts in this district have consistently dismissed so-called "rescission claims" as invalid on their face. *See, e.g.*, *Grant Jones Realty, LLC v. MW Cell REIT I LLC*, No. 24-cv-00701, 2025 WL 1393635, at *4 (D.N.J. May 14, 2025) ("Rescission is not a standalone cause of action but an equitable remedy that depends on the existence of a valid underlying claim."); *see also Achieve 24 Fitness Ltd. Liab. Co. v. Alloy Pers. Training Sols.*, LLC, No. 21-cv-12085, 2023 WL 2264129, at *13 (D.N.J. Feb. 28, 2023); *Hoke, Inc. v. Cullinet Software, Inc.*, No. 89-cv-1319, 1992 WL 106784, at *2 (D.N.J. Apr. 28, 1992).

This imprecision is not a matter of mere formality or nomenclature—it reflects a fundamental defect that goes to the heart of what constitutes a justiciable claim and the Court's authority to grant relief grounded in a recognized legal right. *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 331 (2011) (observing that "entitlement to relief is essential to the existence of a claim or cause of action"). The practical, downstream consequences of that

defect are on full display in Defendant's motion here. Its briefing identifies no underlying cause of action, nor does it attempt to establish the elements of any cognizable claim. Instead, it assembles what it describes as a "standard for rescission," citing authorities of uneven relevance and at times articulating overstated or inaccurate propositions. Moreover, in purporting to apply that standard to the evidence in this case, Defendant makes no mention of any standard of proof —a critical omission for a purported counterclaim implicitly sounding in fraud. *See, e.g.*, *Weil v. Express Container Corp.*, 824 A.2d 174, 182 (N.J. Super. Ct. App. Div. 2003) (recognizing that both legal and equitable fraud "must be established by clear and convincing evidence").

To be clear, Defendant has neither pled nor moved on a claim of equitable fraud, which has historically been the cause of action on which insurers have obtained rescission of insurance policies issued in reliance on an insured's misrepresentations. *See Harford Mut. Ins. Co. v. Z&D Realty, LLC*, 648 F. Supp. 3d 499, 510 (D.N.J. 2022) ("[R]escission is a firmly rooted remedy in the field of insurance, which a party may seek on the basis of equitable fraud."). Indeed, the closest its pleading comes to even asserting a common law fraud claim is in Count II, which is styled as one for "intentional misrepresentation." (ECF No. 54 at 16.) Presumably, Defendant intends this count to sound in legal fraud. *See St. Anargyroi, XIX, Inc. v. Atl. Title Agency, Inc.*, No. A-5250-10T2, 2012 WL 1948622, at *5 (N.J. Super. Ct. App. Div. May 20, 2012) (construing "intentional misrepresentation" claim as one for legal fraud). Even so, Defendant has not moved for summary judgment on this claim—its brief does not explicitly identify the established elements of legal fraud, nor does it acknowledge the heightened evidentiary standard governing the cause of action. *See DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman*, 64 A.3d 579, 586 (N.J. Super. Ct. App. Div. 2013) (identifying five elements of legal fraud and reiterating that a plaintiff "must

prove each element by clear and convincing evidence") (internal quotation marks omitted). Rather, it has unequivocally sought judgment on its "claim for rescission."

Further compounding the confusion, Defendant's pleading actually frames its rescission claim as one for a "declaratory judgment" that the Policy is void under the federal Declaratory Judgment Act, 28 U.S.C. § 2201. (ECF No. 54 at 15–16.) But likewise here, federal courts have repeatedly made clear that the Act merely creates a remedy, not an independent cause of action. *See, e.g.*, *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("[T]he availability of [declaratory] relief presupposes the existence of a judicially remediable right."); *Malhan v. Sec'y United States Dep't of State*, 938 F.3d 453, 457 n.3 (3d Cir. 2019) (observing that the Declaratory Judgment Act "creates a remedy, not rights"); *ASAH v. New Jersey Dep't of Educ.*, 330 F. Supp. 3d 975, 1019 n.25 (D.N.J. 2018) (reiterating that requests for declaratory judgment are prayers for relief, "not independent causes of action," and should accordingly not be pled as separate counts in federal pleadings). Thus, as far as the Court can discern, the legal footing of Defendant's motion is doubly infirm.

The Court does not suggest that rescission would be unavailable in these circumstances. To the contrary, the record, if properly positioned on a recognized cause of action, might well support such relief. But it is not the Court's role to reconstruct Defendant's legal theory or to analyze the elements of a cognizable claim it has neither pled nor moved upon. Defendant, as the moving party, bears the burden of identifying the governing legal standards and demonstrating its entitlement to judgment under them. Because it has failed to do so, its motion must be denied.

### ii. *__Breach of Contract__*

The Court proceeds to consider the merits of Plaintiff's claim. In New Jersey, the elements necessary to prove a breach of an insurance policy are the same for any breach-of-contract claim:

"(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Kimmel v. Massachusetts Bay Ins. Co.*, 787 F. Supp. 3d 18, 23 (D.N.J. 2025) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)).

In the context of a claim for insurance benefits, the second element turns on whether the loss at issue falls within the coverage afforded by the policy. *See, e.g.*, *Feit v. Great-W. Life & Annuity Ins. Co., A Colorado Corp.*, No. 03-cv-2948, 2005 WL 2665736, at *4 (D.N.J. Oct. 18, 2005). The insured thus "bears the burden of bringing [his] claim within the basic terms of the insurance policy." *Arthur Andersen LLP v. Fed. Ins. Co.*, 3 A.3d 1279, 1287 (N.J. Super. Ct. App. Div. 2010). Where, as here, the dispute centers on a policy providing disability income coverage, the insured must establish that he is "disabled," as defined by the policy. *See Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 284 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993). When evaluating an insured's proofs on a motion for summary judgment, courts must give the policy's words "their plain, ordinary meaning," and may not, absent ambiguity, "write for the insured a better policy of insurance than the one purchased." *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001).

Here, Plaintiff claims that he has been totally disabled since February 2018, and that Defendant has been in continued breach of the Policy since terminating his monthly benefits in January 2019. To succeed, Plaintiff must demonstrate that he meets the Policy's definition of "Totally Disabled." (No. 108-1 at 36.[33]) The operative definition is set forth in an "Extended Own-Occupation Disability Definition Rider" attached to the Policy, which states that the prior

---

[33] *See* Extended Own-Occupation Disability Definition Amendment Rider (ECF No. 108-1 at 36.)

definition of "Totally Disabled" contained in the base policy is "deleted and replaced" with the following:

> **Total Disability** or **Totally Disabled** means, *during* and *after* the Elimination Period, that due to Sickness or Injury:
>
>   (a) you are unable to perform the material and substantial duties of your Regular Occupation;
>
>   (b) you are not engaged in any occupation for wage or profit; and
>
>   (c) you receive Regular Medical Care.

(*Id.*[34])

   In his motion, Plaintiff asserts that the record evidence conclusively establishes his disability, thereby entitling him to the Policy's maximum benefits. His argument, however, falters at the outset because it relies on the wrong policy language. For reasons the Court cannot readily discern, Plaintiff's motion cites exclusively to the superseded definition of "Totally Disabled." (ECF No. 99-3 at 22–23.) He offers no explanation for doing so and advances no argument that the Rider is inapplicable or otherwise unenforceable. Given the Rider's clear and unambiguous language, the Court can only assume that Plaintiff seeks to silently adopt the deleted language because it is more favorable to his position—a suspicion seemingly borne out by the superseded definition's less stringent requirements for the first two elements of the operative provision. (ECF No. 108-1 at 24.) Regardless, the Policy must be interpreted and applied as written.

   It is a fundamental tenet of insurance law that "when an order or endorsement modifies, qualifies or restricts the terms of the original policy, the order or endorsement controls." *Gabriele v. Lyndhurst Residential Cmty., L.L.C.*, 43 A.3d 1169, 1174 (N.J. Super. Ct. App. Div. 2012)

---

   [34] The top of the Rider reads: "This rider is made a part of the policy to which it is attached. It is subject to all parts of your policy not in conflict with this rider. In the event of a conflict between this rider and any other provision of the policy, this rider will control." (*Id.*)

(quoting 2 COUCH ON INSURANCE § 21.22 (2d ed. 2010)). "The rationale of this principle is that 'when a specific form of insurance is provided by an endorsement tailored to meet the particular needs of the insured and the [insurance] company, that language must be followed to carry out the intentions of the parties.'" *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981)). The Rider therefore governs, and the superseded definition on which Plaintiff relies is legally irrelevant.

Defendant's competing motion properly applies the operative definition. Citing extensive record evidence, Defendant argues that Plaintiff has not, and cannot, establish two of the three conditions necessary to qualify as "Totally Disabled" under the Policy: (1) an inability to perform the "material and substantial duties" of his "Regular Occupation," and (2) the absence of engagement in "any occupation for wage or profit." (ECF No. 107-1 at 32–41.)

The Court has thoroughly considered Defendant's arguments, but finds no need to analyze either in detail here. In opposing Defendant's motion, Plaintiff nominally addresses these same elements, but inexplicably doubles down on his reliance on the superseded policy definition. (ECF No. 113 at 14.) Plaintiff's continued invocation of a deleted contractual provision could, in many respects, be construed as a concession that he cannot satisfy the operative definition of "Totally Disabled." However, no such inference is necessary—his persistence confirms that he does not seek to enforce any valid provision of the Policy. Having elected to proceed under contract language that is indisputably inapplicable, Plaintiff obviously cannot bring his claim "within the basic terms" of the Policy. *Arthur Andersen*, 3 A.3d at 1287. Thus, as a matter of law, Plaintiff cannot succeed on his claim for breach of contract. *See Gaviria v. Lincoln Educ. Servs. Corp.*, 547 F. Supp. 3d 450, 460–61 (D.N.J. 2021) (stating that a plaintiff "cannot assert a vague breach-of-contract while excluding consideration of the actual, integrated, written contract between the

parties"). Defendant's motion for summary judgment on this claim is therefore granted, and Plaintiff's motion is denied.

### B. Defendant's IFPA Counterclaims

Having disposed of Plaintiff's breach-of-contract claim, the Court next turns to Defendant's counterclaims under the IFPA, N.J. STAT. ANN. §§ 17:33A-1 *et seq.* Both parties seek summary judgment on these claims.

The IFPA was enacted "to confront aggressively the problem of insurance fraud in New Jersey." N.J. STAT. ANN. § 17:33A-2; *see also Merin v. Maglaki*, 599 A.2d 1256, 1259 (N.J. 1992) (recognizing that "[i]nsurance fraud is a problem of massive proportions that currently results in substantial and unnecessary costs to the general public in the form of increased rates"). The statute "interdicts a broad range of fraudulent conduct," and further establishes a private-enforcement mechanism that allows insurers to pursue civil actions against violators. *Land*, 892 A.2d at 245; *see also* N.J. STAT. ANN. § 17:33A-7(a). Successful claimants may recover compensatory damages, including "reasonable investigation expenses, costs of suit and attorneys fees." *Id.* If a court finds that a defendant engaged in a "pattern" of violations—defined as "five or more related violations"—those damages must be trebled. N.J. STAT. ANN. §§ 17:33A-3, 17:33A-7(b).

It has long been recognized that the IFPA "sweeps more broadly than common law fraud." *Citizens United Reciprocal Exch. v. Meer*, 321 F. Supp. 3d 479, 492 (D.N.J. 2018). As the New Jersey Supreme Court has explained, the statute does not merely "codify common law fraud," but rather "supplement[s]" the cause of action "because, standing alone, it had proven to be insufficient in combatting and deterring insurance fraud." *Land*, 892 A.2d at 1247. To this end, the IFPA departs from the common law in at least two respects. *See Bldg. Materials Corp. of Am. v. Allstate Ins. Co.*, 38 A.3d 644, 667 (N.J. Super. Ct. App. Div. 2012).

First, while common law fraud must be established by clear and convincing evidence, an IFPA violation need only be proven by a preponderance of the evidence. *See Land*, 892 A.2d at 1249 (rejecting clear and convincing evidence standard for IFPA violations); *Certain Underwriters at Lloyd's of London v. Alesi*, 843 F. Supp. 2d 517, 530 (D.N.J. 2011) (citing *Land*). Second, the IFPA dispenses with several elements traditionally required at common law. Specifically, a claimant need not demonstrate "reliance on the false statement or resultant damages, nor proof of intent to deceive." *Citizens United Reciprocal Exch. v. Meer*, 321 F. Supp. 3d 479, 493 (D.N.J. 2018); *see also Bldg. Materials Corp. of Am. v. Allstate Ins. Co.*, 38 A.3d 644, 667 (N.J. Super. Ct. App. Div. 2012). Although the precise elements vary depending on the particular violation alleged, the IFPA generally requires a showing of (1) falsity, (2) knowledge, and (3) materiality. *See Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Horizon Blue Cross Blue Shield of New Jersey*, No. 21-cv-10991, 2022 WL 4354654, at *7 (D.N.J. Sept. 20, 2022); *21st Century Ins. Co. v. Felipe Express*, No. 15-cv-7075, 2017 WL 4220429, at *5 (D.N.J. Sept. 22, 2017).

Here, Defendant alleges that Plaintiff committed two general categories of IFPA violations based on allegedly false or misleading statements: (i) those made in connection with his 2016 application for the Policy, and (ii) those made in support of his subsequent Claim for benefits under the Policy between 2017 and 2018. In assessing the truth of Plaintiff's statements, the Court compares them against the sworn statements he has since made under oath and under penalty of perjury—binding admissions that concern not only the nature and extent of his occupational duties, but also the status of his claimed disability and income during the relevant period.

### i. *Application-Stage Statements*

Section 17:33A-4(a)(4)(b) states that a person violates the statute if he:

[p]repares or makes any written or oral statement, intended to be presented to any insurance company or producer for the purpose of obtaining . . . an insurance policy,

knowing that the statement contains any false or misleading information concerning
any fact or thing material to an insurance application or contract.

N.J. STAT. ANN. § 17:33A-4a(4)(b). Here, Defendant alleges that the following representations

violated this provision:

- Plaintiff's statements in his written application for the Policy, in which he represented that he was the "Owner" of a business and that his "exact duties" consisted only of "Administration" (ECF No. 108-1 at 2);

- Plaintiff's statements made during his January 21, 2016 telephone interview with one of Defendant's representatives, during which Plaintiff represented that he functioned as a businessowner with employees and many subcontractors who perform the work (*id.* at 8–10);

- Plaintiff's representations to his insurance producer in response to a direct underwriting inquiry on January 29, 2016, in which he stated that he did not do any of the restoration work, that he relied on subcontractors for that work, and that he was on job sites less than ten percent of the time (*id.* at 16); and

- Plaintiff's Policy Delivery Receipt executed on March 3, 2016, whereby he affirmed that the answers and statements had previously given to support his application were true and complete (*id.* at 48.)

It is undisputed that Plaintiff "prepared" or "made" these statements to obtain the Policy.

*See* N.J. STAT. ANN. § 17:33A-4a(4)(b). To prevail, Defendant must therefore show (1) that the

statements contained false or misleading information; (2) that Plaintiff knew that his statements

contained false or misleading information; and (3) that the information was material to his

application. *See id.*; *see also 21st Century Ins.*, 2017 WL 4220429, at *5. On this record, these

elements are readily established.

First, the record evidence clearly demonstrates that Plaintiff misrepresented the nature of

his occupation and the scope of his duties while attempting to obtain the Policy. In response to a

January 29, 2016 underwriting inquiry, Plaintiff, through his insurance producer, represented that

he did not personally perform any restoration work and that he spent less than ten percent of his

time at job sites. Both statements are demonstrably false, and Plaintiff's sworn statements to the

SSA eliminate any doubt: emphasizing his "hands-on" duties, Plaintiff described a role dominated

by physical exertion, with only a sliver of his time devoted to supervision. He reinforced these admissions during his deposition in this case, testifying that he was on job sites "every single day" and for "every single loss," personally engaging in an array of physically demanding and hazardous tasks. These inconsistencies make clear that Plaintiff's initial representations about his work were not simply incomplete or imprecise, but objectively false.

Plaintiff's other statements to Defendant, though not literally false in isolation, were misleading for what they omitted. In his written application, Plaintiff identified his occupation as an "Owner" of Statewide Commercial and described his "exact duties" as "Administration." Plaintiff reiterated those representations during his subsequent telephone interview. While it is true that he owned the company and performed some administrative tasks, those bare descriptors conveyed the image of a sedentary, office-based executive—a characterization markedly at odds with the physically strenuous, labor-intensive role he later described under oath. In the context of disability insurance, omitting such information was inherently misleading. By failing to disclose his substantial "hands-on" responsibilities, Plaintiff distorted the nature of his occupation and created the false impression of an occupation less susceptible to disability.

The record also establishes that Plaintiff knew that these statements were false or misleading when he made them. Throughout the application process, Defendant posed objective, straightforward factual questions concerning Plaintiff's occupation and job duties. "When a question is unambiguous and calls for a statement of fact, misrepresentation or concealment is inexcusable." *Ledley v. William Penn Life Ins. Co.*, 651 A.2d 92, 96 (N.J. 1995). Plaintiff alone possessed the relevant information, and he was accordingly required to answer those questions "honestly and completely." *Palisades Safety & Ins. Ass'n v. Bastien*, 814 A.2d 619, 623 (N.J. 2003). That he did not do so under these circumstances is sufficient to establish that his

misrepresentations were knowingly made. *See State v. Nasir*, 809 A.2d 796, 803 (N.J. Super. Ct. App. Div. 2002) (finding knowledge element satisfied where prospective insured falsely answered objective questions concerning information that was within his knowledge).

Finally, the undisputed evidence establishes that the information Plaintiff communicated was material to his application. Materiality hinges on whether a misrepresentation would "naturally and reasonably influence[] the judgment of [an] underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium." *Paul Revere Life Ins. Co. v. Haas*, 644 A.2d 1098, 1108 (N.J. 1994) (quoting *Massachusetts Mut. Life Ins. Co. v. Manzo*, 584 A.2d 190, 195 (N.J. 1991)) (alteration in original). Misrepresentations are "equally material if they may be said to have been calculated either to discourage, mislead or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate." *Longobardi v. Chubb Ins. Co. of New Jersey*, 582 A.2d 1257, 1262–63 (N.J. 1990). Plaintiff's misrepresentations here did not concern mere peripheral details—they went to the core of what Defendant needed to know in order to assess the relevant risk. By misrepresenting his on-site work and overstating his administrative role, Plaintiff portrayed himself as a low-risk, sedentary business administrator, and gave no indication of the risks he now claims were specifically insured. Such a distortion would "naturally and reasonably" influence the judgment of any underwriter considering Plaintiff's application. *See Haas*, 644 A.2d at 1108. And while the IFPA does not require proof of reliance, Defendant's actual reliance here —issuing a high-benefit policy on more favorable terms—only underscores the materiality of Plaintiff's misstatements. *See LM Ins. Corp. v. All-Ply Roofing Co.*, No. 14-cv-4723, 2019 WL 366554, at *12 (D.N.J. Jan. 30, 2019).

In his briefings, Plaintiff largely sidesteps the IFPA's legal framework. Rather than engage with the elements of Defendant's counterclaim, he offers a series of factual anecdotes and contextual explanations—none of which alter the substance of his prior representations or otherwise reconcile them with his later sworn statements. Stated differently, the contextual gloss Plaintiff offers does not transform his objectively false misrepresentations into truthful ones, nor do they create a genuine dispute of material fact where none exists.

First, Plaintiff focuses on his written application and argues that it was not technically inaccurate. He maintains that describing himself as a business "Owner" with duties in "Administration" was true, and that his later statements concerning his "hands-on" work merely reflect additional details not captured by the form. To the extent his answers were incomplete, he attributes the omission to the application itself, which provided only a single line to list his "exact duties." (ECF Nos. 99-3 at 16–17; 113 at 9, 11.) No applicant, he contends, could reasonably be expected to capture the full breadth of his work in that space. The Court is not persuaded.

Plaintiff's attempt to blame the brevity of the application form ignores that the application process did not end with the form itself. The record demonstrates that he had at least two subsequent opportunities to disclose the nature of his work. During the telephone interview, he again characterized himself as a self-employed businessowner and gave no indication that his occupation involved any physical labor. More significantly, when Defendant's underwriting department posed a direct follow-up inquiry, Plaintiff disclaimed all of the physically demanding duties that were supposedly indispensable to his role. In short, Plaintiff's statements were not the product of limited space on a form; they were affirmative misrepresentations that concealed the reality of the labor-intensive work he now swears by.

27

Second, Plaintiff appears to contend that Defendant failed to adequately elicit the information that would have made his answers complete and accurate. He claims that between his written application and telephone interview, no one ever asked him "*exactly* what he does on a daily basis." (ECF No. 99-3 at 18.) He further asserts that "[t]here was no follow-up whatsoever" on Defendant's part to ask him "for any further clarification as to each and every job duty he performed on a daily basis." (ECF No. 113 at 8.) The record makes short work of this argument.

Again, Defendant *did* follow up for clarification on his specific occupational duties. In response, Plaintiff provided additional misrepresentations—that he performed no restoration work, that he relied on subcontractors for that work, and that he spent less than ten percent of his time at job sites. These assurances did more than merely misstate reality; they eliminated any reason for an underwriter to inquire further into physical demands and hazards that Plaintiff effectively disclaimed. "An insurer's duty to investigate arises only when there are sufficient facts to call the insurance application into question." *Harford Mut. Ins. Co.*, 648 F. Supp. 3d 499, 513 (D.N.J. 2022). At all times, Plaintiff had a duty to answer questions with "utmost good faith," and was "bound to deal fairly with the disclosure of facts material to the risk" he sought to insure. *Progressive Cas. Ins. Co. v. Hanna*, 719 A.2d 683, 686 (N.J. Super. Ct. App. Div. 1998). Having provided no reason for Defendant to doubt his statements, Plaintiff cannot now fault the insurer for relying on his representations. *See Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 84 (N.J. 1993) ("[A] prospective insured must not misrepresent or conceal information concerning risks entailed in coverage under an insurance policy.").

Third, Plaintiff appears to imply, without explicitly arguing as much, that he had no reason to know that the statements in his written application were false or misleading. In his briefings, Plaintiff emphasizes that he completed the application in the presence of his insurance producer,

Mr. Brooks, while the two met at the "business office" of Statewide/Paramount. (ECF No. 113 at 4.) As Plaintiff tells it, Mr. Brooks had "literal eyes on [his] business" and was able to "see the nature of his work first-hand," implying that Mr. Brooks somehow knew of the extensive on-site duties. (ECF No. 99-3 at 15.) In turn, Plaintiff asserts that he was under the "belief" that if something was "missing or deficient" in his application, "Mr. Brooks would have brought it to his attention to correct it." (ECF No. 99-3 at 18.) According to Plaintiff, "[t]his did not occur, nor did Mr. Brooks direct [him] to add anything to the application or clarify any of the questions on the form." (*Id.*) Construed generously, Plaintiff appears to suggest that he lacked the requisite intent because he relied on his producer to ensure the accuracy of the application. But even so construed, the argument is unavailing.

Ignoring for a moment that the misrepresentations at issue in this case are not restricted to Plaintiff's written application, it is well-settled that prospective insureds, "not their agents, are accountable for the information supplied in their insurance applications." *Harford Mut.*, 648 F. Supp. 3d at 511. In any event, it is undisputed that each of the written statements at issue was made by Plaintiff himself. He completed the application and attested that his answers were both true and complete. He had multiple opportunities thereafter to correct or supplement his disclosures, but did not do so. Instead, he repeated and even expanded upon his initial misrepresentations. When Defendant ultimately issued the Policy, it afforded Plaintiff one final opportunity to correct any inaccuracies. Rather than do so, he executed the Policy Delivery Receipt and, once again, affirmed that all of his prior statements were "true and complete."

Whatever subjective expectation Plaintiff now claims to have held for Mr. Brooks does not negate the fact that he personally knew his answers were false or misleading. "It is irrelevant whether [Plaintiff] had the intent to deceive"—the information asked of him was "indisputably

within his knowledge." *Nasir*, 809 A.2d at 803 (holding that a prospective insured's "state of mind as to how to interpret [an] [objective] question" is irrelevant to determining falsity and knowledge). Any suggestion that Plaintiff did not "know" that his representations were false or misleading is foreclosed by his personal knowledge and the unambiguous nature of the questions themselves. *Id.* And in this particular case, such a suggestion is even further belied by Plaintiff's "extensive background in the insurance industry," specifically in the insurance-claims and loss-adjustment fields. *Id.*

Lastly, Plaintiff attempts to argue that he made no misstatement of any kind in his application. He contends that—when comparing the statements in his written application to those contained in his later Claim submissions—there is, in fact, "no conflict" at all. (ECF Nos. 99-3 at 15; 113 at 11.) The problem, of course, is that his Claim submissions also contained false and misleading statements, in which Plaintiff continued to represent that his occupation was administrative, not labor-intensive. In essence, Plaintiff draws an apples-to-apples comparison that only demonstrates consistent falsehoods. The truth and accuracy of Plaintiff's prior representations must be measured against the sworn statements he has offered elsewhere under oath. Put simply, an agreement between apples means nothing when the truth requires an orange.

In conclusion, the undisputed evidence establishes that Plaintiff made false and misleading statements in connection with his application for disability insurance, that he knew those statements were false or misleading when made, and that they were material to his application. These facts satisfy each element of Defendant's counterclaims under the IFPA as they relate to the application stage. Accordingly, Defendant is entitled to summary judgment on that portion of its IFPA counterclaims, and Plaintiff's motion is denied to the same extent.

### ii. *Claims-Stage Statements*

Next, the Court addresses Defendant's IFPA counterclaims premised on the statements

Plaintiff made in connection with his Claim for benefits. The IFPA states that a person violates the

statute if he:

> [p]resents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim.

N.J. STAT. ANN. § 17:33A-4(a)(1). Based on this provision, Defendant alleges the following

violations:

- Plaintiff's submission of the Insured's Occupational Description dated July 5, 2017, in which he represented that his principal duties, "in order of their importance," were "Sales/Marketing" and "Manage staff & subcontractors"; that the nature of those duties was "sedentary," involving "sitting, walking, and standing"; and that any objects lifted weighed "between zero and 10 pounds" (ECF No. 108-5 at 40);

- Plaintiff's February 8, 2018 letter to Defendant, in which he stated that he had completely stopped working as of February 1, 2018 (*id.* at 50); and

- Plaintiff's five submissions to Defendant between February and December 2018, where each time he represented that he was not working and that he was earning no income (ECF No. 107-4 at 2–8.)

It is undisputed that Plaintiff "presented" these statements to Defendant in support of his

Claim.[35] *See* N.J. STAT. ANN. § 17:33A-4(a)(1). Defendant must therefore show (1) that the

statements contained false or misleading information; (2) that Plaintiff knew that his statements

contained false or misleading information; and (3) that the information was material to his Claim.

---

[35] The Court separately notes that Plaintiff has failed to respond to Defendant's motion concerning the claim-stage IFPA counterclaims. In his opposition, Plaintiff merely incorporates by reference the arguments previously raised in his own motion for summary judgment. *See* Pl.'s Opp'n Br. at 11 ("Plaintiff would rely upon his argument set forth in his Motion for Summary Judgment filed November 27, 2024.") (ECF No. 113 at 12.) However, those arguments address only Plaintiff's statements made "in [the] procurement of the Policy," not those made in connection with his Claim. *See* Pl.'s Mot. Br. at 9, 10–15 (ECF No. 99-3 at 13, 14–19.) Regardless, the elements of § 17:33A-4(a)(1) are clearly established here.

*See id.*; *see also Allstate New Jersey Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015). Here too, the Court finds these elements satisfied.

First, the record shows that Plaintiff continued to misrepresent the nature of his occupation and the scope of his duties, this time in seeking the benefits of the Policy. Plaintiff's statements that his job was "sedentary" or principally administrative are squarely contradicted by his sworn SSA filings and deposition testimony, in which he described performing daily, physically intensive restoration work. Plaintiff plainly knew that his characterizations were false—he had personal knowledge of the truth and responded to objective, unambiguous questions with untrue statements. *See Nasir*, 809 A.2d at 803. Lastly, these misrepresentations were irrefutably material because the nature of his job duties was central to Defendant's determination of whether his hip condition rendered him "unable to perform the material and substantial duties of [his] Regular Occupation," as required by the Policy's definition of "Total Disability." *See State v. Goodwin*, 129 A.3d 316, 323 (N.J. 2016) ("[A] statement of fact is material if it could have reasonably affected the decision by an insurance company . . . to pay a claim."). By portraying his occupation as that of a sedentary business administrator, Plaintiff falsely suggested that even limited mobility would prevent him from performing his essential duties, thereby materially inflating the extent of his claimed disability.

The same conclusion follows with respect to Plaintiff's statements concerning his disability status. Plaintiff's own federal tax filings conclusively disprove his representations that he ceased working and earned no income after February 1, 2018. For example, Plaintiff's Schedule C forms for Statewide report substantial gross receipts and sales in every year following his alleged work cessation—$738,593 in 2018, $1,513,438 in 2019, $2,582,878 in 2020, $5,189,317 in 2021, $4,788,434 in 2022, and $4,206,084 in 2023. (ECF No. 108-3 at 42, 60, 79, 99, 122, 143.) The

accompanying expense schedules likewise reflect extensive operating and labor costs, consistent only with an ongoing, actively managed enterprise—not a dormant or residual business.[36] (*Id.*)

Taken together, the reported revenues and expenses establish that Statewide continued to engage in substantial commercial activity, which necessarily required active management and oversight by its sole proprietor. But perhaps most definitively, Plaintiff affirmed in each of these returns that he "materially participated" in Statewide's operations and services for each applicable tax year—a designation that both conferred favorable tax treatment and necessarily acknowledged that his income was not passively derived. (*Id.*) He also attested to similar participation in other for-profit ventures during this same period, including Paramount. (*Id.* at 44, 62.) On this record, none of these sworn statements to the IRS can be reconciled with Plaintiff's representations to Defendant that he had ceased performing all work duties and was engaged in no income-producing activity.

The truth concerning Plaintiff's work and income rested within his personal knowledge, so he necessarily knew his representations to be false when he stated otherwise. *See Nasir*, 809 A.2d at 803. In any event, Plaintiff personally signed and attested to the accuracy of his tax returns, placing his knowledge of these falsehoods even further beyond dispute. His knowledge concerned information that was plainly material to his Claim—whether Plaintiff was "engaged in any occupation for wage or profit" was a central eligibility requirement under the Policy. By concealing his active, ongoing job activity and earnings, Plaintiff misrepresented facts fundamental to Defendant's evaluation of his Claim and determination of benefit entitlement. *See Goodwin*, 129 A.3d at 323.

---

[36] Such expenses included reported costs for advertising; insurance; legal and professional services; office expenses; taxes and licenses; travel; utilities; wages; and other business-related expenses. (ECF No. 108-3 at 42, 60, 79, 99, 122, 143.)

In conclusion, the undisputed record evidence clearly demonstrates that Plaintiff has violated the IFPA, both in connection with his application and later in support of his Claim to the Policy's benefits. Defendant has shown multiple, related misrepresentations at both stages, satisfying the statutory definition of a "pattern" of fraudulent conduct and entitling Defendant to treble damages. *See Travelers Prop. Cas. Co. of Am. v. Quickstuff, LLC*, No. 14-cv-6105, 2016 WL 7231605, at *5 (D.N.J. Dec. 14, 2016) (finding treble damages warranted on motion for summary judgment where defendant had made at least five related misrepresentations). Defendant is entitled to summary judgment on its IFPA counterclaims, and Plaintiff's motion must be denied accordingly.[37]

## V.    CONCLUSION

For all of the reasons set forth above, the Court grants Defendant's motion for summary judgment in part, but only with respect to its IFPA counterclaims and Plaintiff's breach-of-contract claim. Plaintiff's motion for summary judgment is denied in its entirety.

Dated: October 22, 2025

KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE

---

[37] In light of this disposition, the Court suspects that Defendant has no reason to proceed with its remaining claims for intentional and negligent misrepresentation, as set forth in Counts II and III of its pleading. However, because Defendant did not specifically move on or defend these claims in opposing Plaintiff's motion—which expressly sought summary judgment on these counts—the Court deems them abandoned. *See Addison v. Signet Jewelers Ltd.*, No. 1:23-cv-22956, 2025 WL 1766119, at *8 n.4 (D.N.J. June 26, 2025) (observing that the failure to defend specific claims constitutes abandonment).